J-S27005-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.W.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.T., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1083 EDA 2022 |

Appeal from the Decree Entered March 23, 2022
In the Court of Common Pleas of Monroe County
Orphans' Court at No:  40 OCA 2021


BEFORE:  STABILE, J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY STABILE, J.:                    **FILED OCTOBER 18, 2022**

B.T. ("Father") appeals from the March 23, 2022 decree,[1] in the Monroe County Court of Common Pleas, granting the petition of Stepfather, and terminating involuntarily his parental rights to his minor son, C.W.T. ("Child"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1) and (b).  After careful review, we affirm.

The orphans' court set forth the following findings of fact:

---

[1] While dated March 23, 2022, the decree was not entered for purposes of Pa.O.C.R. 4.6(b) (stating, "The clerk shall note in the docket the date when notice was given to the party or to his or her counsel under subparagraph (a) of this Rule.") until March 24, 2022, upon the docketing of notice.  **See** Note Pa.O.C.R. 4.6 (noting that the Rule is "derived from Pa.R.C.P. No. 236."); **see also Frazier v. City of Philadelphia**, 735 A.2d 113, 115 (Pa. 1999) (holding that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given"); **see also** Pa.R.A.P. 108(a) (entry of an order is designated as "the day on which the clerk makes the notation in the docket that notice of entry of the decree has been given as required by Pa.R.Civ.P. 236(b)".).

1. [Child] was born [in] September [] 2017. . . .

2. [M.Z.] ("Mother") is the natural mother of [Child] and resides in Monroe County, PA.

3. [B.T.] ("Father") is the natural father of [Child] and resides in Monroe County, PA, but is currently incarcerated at SCI Coal Township.

4. [S.G.] ("Stepfather") is married to [Mother]. He resides with [Mother and Child] and he and Mother have a younger child together. Their date of marriage is June 7, 2020.

5. Mother and Father were never married[] but were in a relationship for a period of time that resulted in the birth of [Child].

6. Mother and Father continued to reside together until October 27, 2018. On that date, Father became intoxicated and was belligerent and violent toward Mother and her mother. Mother also reported that Father began shaking [Child] in a defiant manner in front of her. Mother stated Father then left the residence, crashed his truck, and returned to the residence at which time he terrorized Mother and [Child] until police officers arrived at the scene and arrested him.

7. Mother obtained a temporary Protection From Abuse Order ("PFA"), and then a permanent three (3) year PFA against Father. . . . Father was not allowed contact with Mother, except as to custody of [Child].[2]

8. Mother also obtained a custody order dated December 13, 2018 . . ., granting her sole legal and physical custody.

9. Father was incarcerated following his arrest, and eventually entered a guilty plea to endangering the welfare of a minor and reckless endangerment. As a result, he served 18 months of incarceration from October 2018 to May 2020. He has since completed the maximum term of that sentence.

---

[2] The PFA order granted Mother sole custodial rights with respect to Child. N.T., 3/2/22, at 19.

10. Father was previously incarcerated due to a conviction for drug delivery resulting in death, for which he has 12 1/2 years of parole left.

11. Father has been incarcerated since January 2022 for violating that parole by taking pain pills. . . .

12. Father stated he is engaged in treatment programs required of his parole violation order, and upon completion of the programs, he expects to be re-released on parole at the end of April 2022.

13. Father has not seen [Child] since the date of the incident on October 27, 2018.

14. The PFA order expired on November 19, 2021.

15. Father never sought to modify the PFA order.

16. Father has sent no cards, gifts or letters to [Child].

17. Father has never provided any support for [Child].

18. Father did file for modification of custody on October 20, 2020, after Mother had sent him correspondence seeking his voluntary relinquishment of parental rights so Stepfather could adopt [Child].

19. Following a custody conciliation conference on Father's petition for modification, Father was ordered to complete a psychological evaluation and a drug and alcohol evaluation before he would be granted any change to the prior custody order.

20. A follow-up custody conference was scheduled for March 30, 2021 as to Father's progress on the evaluations. No further court orders were issued[,] and Father blamed it on his attorney notifying him at the last moment he could not attend the March 30, 2021 conference. The last custody order dated January 14, 2021 required Father to complete the evaluations. . . .

21. Father never submitted the completed evaluations, nor did he request an additional conference, or a full hearing before the court.

22. Father asserts the custody conciliator may have been willing to accept prior evaluations done while he was incarcerated, but neither he nor his attorney could get copies to provide to the court.

23. Father did eventually obtain a drug and alcohol evaluation from Building and Enabling Sobriety Together ("BEST")[] and submitted a recommendation dated August 17, 2021, from an assessment conducted on July 7, 2021.

24. Father has since engaged in drug treatment[] and sees a psychologist since his January 2022 incarceration. He stated that he completed the required co-parent class for custody after filing for the modification on October 20, 2020. Father also testified that he previously engaged in an anger management program, family relations, and other programs while incarcerated.

25. [Child] is bonded to Stepfather, considers him to be his father, and calls him "Dad."

26. [Child] has no bond at this time with Father[] and would not recognize him.

27. Stepfather wants to adopt [Child]. . . .

28. No one else in Father's family has maintained contact with [Child] since the 2018 incident.

Opinion, 3/23/22, at 2-5.

Stepfather filed a petition for adoption and a petition for the involuntary termination of Father's parental rights on July 2, 2021.[3, 4] Mother executed a consent to the proposed adoption. *See* 23 Pa.C.S.A. § 2711(a)(2) (Consents

---

[3] Despite references by the court and the parties to the contrary, careful review of the pleadings confirms Stepfather is the sole named petitioner in both petitions. *See* 23 Pa.C.S.A. § 2512(a)(3) (providing that a petition to terminate parental rights may be filed by "[t]he individual having custody or standing [*in loco parentis*] to the child and who has filed a report of intention to adopt required by section 2531 (relating to report of intention to adopt);" *see also In re Adoption of J.D.S.*, 763 A.2d 867, 868 (Pa. Super. 2000) (petitions for involuntary termination and adoption filed by stepfather).

[4] We observe that the petition for termination of Father's parental rights references language suggestive of and/or citations to 23 Pa.C.S.A. § 2511(a)(1) and (b). Petition for involuntary Termination of Parental Rights, 7/2/21, at ¶¶ 5, 7.

necessary to adoption) (requiring consent of "[t]he spouse of the adopting parent, unless they join in the adoption petition."). The orphans' court conducted a hearing on March 2, 2022.[5] Father was represented by counsel and participated telephonically as he was incarcerated in a state correctional facility.[6] Child, who was four and a half years old at the time, was represented by legal counsel.[7] Stepfather testified on his own behalf, and additionally

---

[5] Notably, during the hearing, the court took judicial notice of the PFA and custody orders, as well as the entire custody record. N.T., 3/2/22, at 24, 96-97. While these were not admitted as evidence and included with the certified record, given the testimony regarding same, we do not find that this hampered our review. Because Father does not assert error or claim prejudice, we do not address the propriety of this judicial notice. We however remind the court that "a court may not ordinarily take judicial notice in one case of the records of another case, whether in another court or its own, even though the contents of the records may be known to the court." *In re: T.B.*, 2021 WL 4551600, at *7 (Pa. Super. 2021) (internal quotation marks and citation omitted).

[6] As noted *supra*, Father had been incarcerated on a parole violation. Father testified that he was paroled with certain conditions and expected to be released the following month, in mid to late April 2022, upon fulfilling those conditions. N.T., 3/2/22, at 63-64, 93. He further confirmed 12 ½ years remaining on parole. *Id.* The certified record is devoid of further details, such as when and if Father was released from incarceration.

[7] Pursuant to order dated July 7, 2021, and entered July 8, 2021, the court appointed Victoria Strunk, Esquire, as counsel for Child. At the conclusion of the proceeding, Attorney Strunk argued in support of termination of Father's parental rights. *Id.* at 94. Attorney Strunk further noted that, although she spoke with Mother and Stepfather, she did not speak to Child, explaining, "As you heard today, [Child] is unaware of [Father]. So[,] I did not have the conversation with him about the TPR/adoption." *Id.* Given the circumstances of Child's young age and his lack of awareness of Father and acknowledgement of Stepfather as his father, we find that Attorney Strunk fulfilled her role. *See In re P.G.F.*, 247 A.3d 955, 966-968 (Pa. 2021) (finding counsel who declined to inform six-year-old child, who was unaware of biological father and

*(Footnote Continued Next Page)*

presented the testimony of Mother. Father testified on his own behalf. At the conclusion of the hearing, the court held the matter under advisement. N.T., 3/2/22, at 96-97.

On March 23, 2022, the orphans' court issued a decree involuntarily terminating Father's parental rights, as well as a contemporaneous opinion.[8] Thereafter, on April 22, 2022, Father, through appointed counsel, filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Pursuant to order of May 2, 2022, the court indicated that all issues were addressed in its prior opinion.

On appeal, Father raises the following issue for our review:

1. Whether the court erred in finding that petitioner proved the elements of 23 [Pa.C.S.A. § 2511(a)(1)] by clear and convincing evidence?

---

identified stepfather as father, of biological father's existence and provide a full explanation of the termination proceedings had "properly fulfilled her obligation," stating, "We will not mandate that an attorney convey highly sensitive, significant, and potentially emotionally damaging information to a child, or engage in a raw inquiry, merely to discern the clearest indication of a child's preference. . . . Accordingly, and significantly, we deem concern for a child's physical, mental, and emotional well-being to be a valid consideration when counsel attempts to discern the child's preference."); **see also In re Adoption of C.J.A.**, 204 A.3d 496, 502 (Pa. Super. 2019) (concluding that counsel, who did not disclose father's existence to six-year-old child, exercised "reasonable judgment" and "discharged her duty as [c]hild's counsel to the best of her ability, based on his age, mental condition, and emotional condition.").

[8] While the orphans' court does not reference a specific subsection of Section 2511(a) as it relates to the termination of Father's parental rights in its decree, the court addresses subsections (a)(1) and (b) in its accompanying opinion.

Father's Brief at 4 (suggested answer omitted).

We review involuntary termination orders for an abuse of discretion, which our Supreme Court has explained "is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). An appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*.

Termination of parental rights is governed by Section 2511 of the Adoption Act. If the trial court determines the petitioner established grounds for termination under subsection 2511(a) by clear and convincing evidence, then the court must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

In this case, the orphans' court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), and (b), which provide as follows:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> > . . .
>
> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

We have explained this Court's review of a challenge to the sufficiency of the evidence to support the involuntary termination of a parent's rights pursuant to Section 2511(a)(1) as follows:

> To satisfy the requirements of Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,
>
> > Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. **Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing**

- 8 -

> **parental claim to a child or fails to perform parental duties.**
>
> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (internal citations omitted) (emphasis added).

As it relates to the crucial six-month period prior to the filing of the petition, this Court has instructed, "[I]t is the six months immediately preceding the filing of the petition that is most critical to our analysis. However, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provisions, but instead consider the individual circumstances of each case." *In re D.J.S.*, 737 A.2d 283, 286 (Pa. Super. 1999) (citations omitted). This requires the Court to "examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." *In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citation omitted).

Further, we have stated:

> [T]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity

to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

*In re Z.P.*, 994 A.2d 1108, 1119 (Pa. Super. 2010) (citation omitted); *see also In re Adoption of C.L.G.*, 956 A.2d 999, 1006 (Pa. Super 2008) (*en banc*).

Regarding the definition of "parental duties," this Court has stated:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. **Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.**

*In re B., N.M.*, 856 A.2d at 855 (internal citations omitted) (emphasis added).

Critically, incarceration does not relieve a parent of the obligation to perform

parental duties. **An incarcerated parent must "utilize available resources to continue a relationship" with his or her child**. *In re Adoption of S.P.*, 47 A.3d at 828 (*discussing **In re Adoption of McCray**, 460 Pa. 210, 331 A.2d 652 (1975) (emphasis added)).

In the case at bar, in finding grounds for termination of Father's parental rights pursuant to Section 2511(a)(1), the orphans' court reasoned that Father's lack of contact with Child without sufficient excuse established grounds pursuant to Section 2511(a)(1). Opinion, 3/23/22, at 8-11. The court stated:

> Father has not seen or spoken to [Child] in over three years. [Child] was only one year old when Father was last involved in his life. Although Father has been incarcerated for a good portion of that time, he did not call or send letters, cards or gifts to [Child]. He provided no support or essentials to [Child] of any kind, and even though there was no child support order, he never provided Mother with any kind of financial assistance. Father's lack of contact with [Child] meets the requirements under [23 Pa.C.S.A. Section 2511(a)(1)] for failing or refusing to perform parental duties for at least six months prior to the filing of the [termination of parental rights] petition.

*Id.* at 8. The court noted Father's reliance on his incarceration, the PFA order, as well as the inaction of his attorney and difficulty in obtaining completed evaluations related to the custody matter, for the lack of contact and delays. *Id.* at 8-11. The court emphasized Father's lack of any contact or activity whatsoever during his incarceration to maintain a bond with Child. *Id.* at 8. The court further suggested that the PFA order did not prohibit contact with Child, or with Mother related to custody, and notes that Father failed to

- 11 -

request any modification thereto. *Id.* at 9. Lastly, the court indicated that Father waited two years, and until after Mother sent him documentation regarding voluntarily termination of his parental rights and adoption by Stepfather, to request a modification of custody. *Id.* at 10. Likewise, the court noted ample time for Father to obtain the required evaluations and proceed with his modification, recognizing that an additional eighteen months had passed. *Id.* at 10-11. As such, the court dismissed Father's excuses, explaining, "We find the reasons Father set forth as barriers preventing him from performing parental duties and maintaining a bond with [Child] to be ones he could have overcome, or at least ones he could have made more of an effort to accomplish. Therefore, we find that Father has failed to provide a reasonable excuse for his lack of contact." *Id.* at 11.

Father, however, emphasizes the importance of the six-month time-period prior to the filing of the termination petition and argues that he engaged in efforts to the extent available. He suggests that Mother created obstacles through obtaining PFA and custody orders and that, in the significant six-months prior to the filing of the termination, he had in fact been "actively engaged" in the custody proceedings, his only available avenue. Father's Brief at 10-13. Specifically, Father relies on *In re Adoption of C.M.*, 255 A.3d 343, 368 (Pa. 2021), and its stated proposition that "a parent's legal efforts to enforce custodial rights demonstrate affirmative performance of a positive parental duty." *Id.* at 11-12. He further asserts that Mother admitted that she would not have let Child speak to him and would not have provided Child

any gifts from Father. *Id.* at 10. Additionally, he maintains a fear of contact with Mother due to her insistence to police that he was attempting to violate the PFA order. *Id.* at 10-11. Father argues:

> Viewing this case under the circumstances under which [F]ather found himself, his explanation for his lack of parenting was completely reasonable. Of major significance is that [F]ather's hands were tied both through a PFA and parole.[9] Father did the only thing he could do by filing in court. Upon his release from jail, he saved up enough money, hired a lawyer and filed to modify his custody order. Father was still prevented through the custody case from having contact with his son until fulfilling certain requirements. Father was actively working on fulfilling those requirements while taking care of a sick relative and battling through the COVID pandemic. Father thought he had already fulfilled the mental health evaluation and was trying to obtain the results and did in fact engage in a drug and alcohol evaluation. Mother waited barely six months from the time [F]ather was ordered to do evaluations before filing for termination of his rights. Custody proceedings were still being held in that six-month time frame preceding the filing of the petition with one as late as March, just four months from the date of filing.
>
> Father in no way evidenced a settled purpose of relinquishing his parental rights as he had a reasonable explanation for lack of contact and exhausted all remedies available to him to parent his son.

*Id.* at 14-15.

Upon review, the record supports termination pursuant to Section 2511(a)(1). The record reveals that Father was incarcerated from October 2018, to May 2020. N.T., 3/2/22, at 14-15, 50. At the time of the termination hearing, pursuant to PFA order and subsequent custody order, Father had not

_____

[9] In addition to the PFA order, Father testified that his parole prevented him from contact with Mother. N.T., 3/2/22, at 51-52, 59, 84-85.

been afforded any custodial rights for a period of almost three and a half years, since Child was one year old. *Id.* at 19, 32. The record further evidences a lack of contact during this entire period of time, despite the PFA order not prohibiting contact with Child, or contact with Mother related to custody, and expiring in November 2021. *Id.* at 15-16, 20, 30-31, 34-35, 51, 59, 84-85. Father admitted that "there was nothing saying I couldn't contact [Child]."[10] *Id.* at 52. Mother testified that she did not take any action to prevent contact. *Id.* at 34. Mother further stated that her telephone number and that of her mother have not changed, and that Father was aware of her new address. *Id.* at 27, 33-34.

While Father filed a custody modification after approximately two years, in October 2020, this came after communication from Mother in July 2020 requesting the voluntary termination of his parental rights so Stepfather could adopt Child, and five months after Father had been released from prison in May 2020. *Id.* at 15-16, 23, 26, 32, 52-53, 84; *see also* Petitioner's Exhibit 1. Thereafter, another 18 months passed without Father furthering the custody matter in any appreciable manner. *Id.* at 32-33.

In particular, following a conciliation/conference in late 2020, the court required Father to complete certain evaluations, including psychological and

---

[10] As noted above, Father contended that his parole prevented him from contact with Mother. *See supra* n.6.

drug and alcohol,[11] with a focus on the need for additional anger management, issuing an order on January 14, 2021. ***Id.*** at 23, 32-33, 53, 70-71, 89-90; ***see also*** Motion to Continue, 10/28/21, Exhibit A, at ¶¶ 2, 16. Although Father acknowledged these requirements and participated in a review conference/conciliation in March 2021,[12] he explained his understanding that he could petition to again bring the custody matter before the court once he completed these obligations. ***Id.*** at 80, 83-84, 89-91 (stating, in part, "[S]he told me that once I get everything done, then I can petition and come back in."). Critically, Father testified to the completion of a drug and alcohol evaluation in July 2021, previous completion of anger management, and attempts to obtain copies of evaluations completed while incarcerated. ***Id.*** at 53-57, 68, 70-71, 81-84. Despite recognizing fulfillment of certain components in the context of disposition of the criminal matter, and prior to being ordered in the custody matter, Father noted the suggestion of the custody master that these prior evaluations completed in relation to his criminal matter may be accepted. ***Id.*** at 53, 55, 70, 76-78, 80. However, no

_____

[11] Specifically, the order directed a psychological evaluation with Carbon-Monroe-Pike Mental Health and Developmental Services and a drug and/or alcohol evaluation with A Better Today, Inc., Outpatient Treatment Center. Motion to Continue, 10/28/21, Exhibit A, at ¶ 2. The order further provided for the "[f]ocus to include, but not be limited to[, the] need for additional anger management counseling." ***Id.*** at ¶ 16.

[12] Father stated that his attorney in the custody matter notified him the night prior to the March 2021 review conference/conciliation that he would not be appearing on Father's behalf. N.T., 3/2/22, at 55, 58, 70.

evidence was presented that Father actively pursued his custody complaint in court.[13]  As such, the record is devoid of evidence of Father's proactive pursuit of custodial rights during the six-month period prior to the filing of the termination petition on July 2, 2021.  *See Cf. In re Adoption of C.M.*, 255 A.3d at 368 (finding, regardless of a prior absence, father "continuously exercised parental duties during the two months preceding the filing of the petition," where he initiated and actively pursued his complaint for custody, engaged in mediation and conciliation, and began compliance with court-mandated requirements.).

Likewise, throughout this time, Father conceded a lack of financial support of Child.  *Id.* at 93.  Moreover, Father experienced a relapse with respect to drugs and alcohol and was re-incarcerated at the time of the termination hearing.[14]  *Id.* at 6, 62, 69.

As such, the record supports the court's determination, upon consideration of the totality of the circumstances, as to Father's failure to perform parental duties, including lack of contact, within the six months prior to the filing of the July 2021 termination petition and throughout most of Child's life, and lack of effort to overcome obstacles.  We reiterate, "Parental

---

[13] Father testified to caring for sick relatives during this time and being unaware of any time limit for meeting his obligations.  *Id.* at 80-81, 87-88, 91.

[14] In connection with this incarceration, Father testified to participation in drug and alcohol and growth programs.  *Id.* at 63-64.  He described the growth program as "like an anger management, complete, like, with relationships, with family, with kids, it's everything."  *Id.* at 64.

rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with the child's physical and emotional needs." *In re B., N.M.*, 856 A.2d at 855 (citation omitted). Mindful of our standard of review set forth above that we must not substitute our judgment for that of the trial court, as we discern no error of law or abuse of discretion, we do not disturb the orphans' court's finding of grounds for termination pursuant to Section 2511(a)(1).

We next determine whether termination was proper under Section 2511(b). As to Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and

caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted). Nevertheless, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *T.S.M.*, 71 A.3d at 267. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the Section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (*quoting In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Father, however, has failed to preserve and waived any challenge related to Section 2511(b) for failure to raise same in the Statement of Questions Involved portion of his brief and failure to offer any such discussion

in his brief. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa. Super. 2017) (citations omitted) (explaining this Court will not review an appellant's claim unless it is included in the statement of questions involved, developed in his or her argument, and supported by citation to relevant legal authority).

Even if Father had preserved a challenge to Section 2511(b), we would conclude that it is without merit. Instantly, in determining that termination would serve Child's needs and welfare pursuant to Section (b), as recognized by the orphans' court,

> Here, [Child] is bonded with Stepfather. . . . [Child] looks to Stepfather as his parent[] and believes him to be his father. Stepfather has been involved in [Child's] life since he was just over a year old. [Child] has no bond with Father and would not be able to recognize him. Father has had no involvement with [Child] since he was one year old. Father's family has had no contact with [Child] for the same period of time. . . . [Child] is now approaching school age and has only had Stepfather present as his father figure for the majority of his life.

Opinion, 3/23/22, at 11-12.

This is supported by the record. As testified by Mother,

> [Stepfather] has been in [Child]'s life since [Child] was a year old. . . . [Child] has always looked up to [Stepfather]. He's – [Stepfather] has always been there for me and him with only good intentions in his heart and soul. My son sees him as his best friend. My son has seen [Stepfather] as his father and only father, since that time. [Stepfather]has been his father, his only father, for the past three years of his four years of life. And [Child] – [Child] doesn't know any other person to be his dad. He wouldn't ever understand because he loves [Stepfather] and [Stepfather] loves him. And he has provided him and me with a nice, secure, stable, happy, healthy lifestyle. . . .

N.T., 3/2/22, at 17. This was confirmed by Stepfather who stated, in part, "I love [Child] as he was my own child, and I always have. . . . . I will always see him as my son and nothing else." *Id.* at 46-47. Hence, regardless of waiver, we would discern no error of law or abuse of discretion in the court's finding that termination of Father's parental rights would best serve Child's needs and welfare pursuant to Section 2511(b).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the orphans' court appropriately terminated Father's parental rights under 23 Pa.C.S.A. § 2511(a)(1) and (b).

Decree affirmed.

Judge Sullivan joins the memorandum.

Judge Nichols concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/18/2022